## Pollock v. Brainard and another.

*(Circuit Court, D. Nebraska. March 9, 1886.)*

1. **Evidence—Answer in Equity under Oath—Evidence to Overcome.**

   In a suit for specific performance of a contract for the sale of land, where defendant, in his answer duly verified, denies that he received a telegram, forming part of the contract, "such as is copied in the complainant's bill;" and complainant testifies that he sent the telegram just as copied in the bill, and produces a copy made by himself at the time of sending it; and defendant, though sworn as a witness, and notified to produce papers, neither produces the telegram actually received, nor says a word about it in his deposition,—all the requirements of equity practice are complied with, and it must be taken as proved that such a telegram passed between the parties, and formed part of the alleged contract.

2. **Specific Performance—Tender—Refusal to Perform.**

   Where a party has flatly refused on his part to carry out the contract, a tender by the other party of performance is not necessary before bringing a suit for specific performance.

3. **Same—Contract to Sell Land—Evidence—Letters and Telegrams—Certainty—Acceptance.**

   On examination of the evidence and the letters and telegrams forming the contract to sell the land involved in this case, *held*, that the contract was sufficiently certain, that there was an acceptance by defendant of complainant's offer to buy, and that specific performance should be decreed.

In Equity.

*Barnes Bros.* and *Guy R. Wilber*, for complainant.

*Groff & Montgomery*, for defendants.

BREWER, J. This is a bill for the specific performance of a contract for the sale of real estate. The negotiations were carried on and the contract consummated, if at all, by correspondence. The entire correspondence, and in its chronological order, is as follows:

EXHIBIT A.

"COLERIDGE, CEDAR CO., NEB., April 8, 1884.

"*Chas. D. Brainard, Peoria, Ill.*—DEAR SIR: Did you ever own the S. W. ¼ Sec. 17, Tp. 30, R. 2 E.? I have a tax deed for the land. It was sold a long time ago. I offered to buy the quitclaim only for the purpose of quieting title and settling a controversy. Mr. Jenel, who assumed to be the agent, would not consider my offer, nor tell me where the owner lived. Mr. C. J. Off thought you might be the man, and if you are, please write and tell me what you would want for a quitclaim. I have 2 teams breaking on it now.

"Respectfully,         W. A. POLLOCK."

*Second.* Brainard's answer, being—

EXHIBIT A. A.

"APRIL 16.

"*W. A. Pollock, Esq., Coleridge, Cedar County, Nebraska:* Your favor of 8th at hand, and, owing to my absence from the city for a few days, has not been answered more promptly. Yes, sir; I own the S. W. ¼ 17, 30, 2, and would sell my interest in the same. I am aware of your having a tax title to the land, but I do not consider it equal to mine. I would prefer to sell my interest to you, and have no controversy about it. I want $500 for my interest. Mr. John Comstock, of this city, is now in your vicinity, and has power of attorney to act for me. I would be pleased to hear from you either through him or personally.

"Yours, respectfully,         CHAS. D. BRAINARD."

*Third.* Pollock's reply to Brainard, being—

EXHIBIT B.

"COLERIDGE, NEB., April 19, 1884.

"*Chas. D. Brainard, Esq., Peoria, Ill.*—DEAR SIR: Yours of the 16th is before me, and contents considered. I am glad that you are the owner, as you say, of that land. I had been led to suppose I was the owner. I am glad I have a gentleman to deal with in a controversy, and I pride myself on dealing fairly. I will make you an offer for your quitclaim to the S. W. ¼, sec. 17, 30, 2 E., not because I am afraid of my title, for, if there is a tax title in the state that will hold, this one of mine will. I would sooner give to you than to spend the money at law, and I will make you this and my only offer. You make me quitclaim deed and I will give you $400 mortgage and my note, payable in one or two years, with 8 per cent. interest, on the same land, which will be just as good as cash to you. You say Mr. Comstock has authority to adjust the matter. I understood Mr. J. P. Johnson to tell Mr. C. J. Off that Mr. C. had been called off somewhere else; at least Mr. C. has not been here yet. Mr. Off can tell you about me. If this proposition is accepted, it must be at once. You can execute the papers, quitclaim, and mortgage and note, and send to Dr. Johnston or Mr. Comstock, and I can execute the mortgage,—close it up. Remember is a compromise measure, and if not accepted is not to prejudice my claim.

"Respectfully,         W. A. POLLOCK."

*Fourth.* Pollock's telegram, being—

EXHIBIT C.

"WAKEFIELD, NEB., 29, 1884.

"*Chas. D. Brainard:* Accept your offer, and pay you five hundred. So. west seventeen. Send deed to Bow Valley Bank.

"W. A. POLLOCK."

*Fifth.* Brainard's telegram, being—

EXHIBIT D.

"PEORIA, ILL., April 29, 1884.

"*W. A. Pollock, Wakefield, Neb.:* I notify Comstock to make sale to you, or to return papers to me and I will.　　　　CHAS. D. BRAINARD."

*Sixth.* Pollock's letter confirming his telegram, and refusing to deal with Comstock, being—

EXHIBIT E.

"COLERIDGE, CEDAR COUNTY, NEB., May 4, 1884.

"*Chas. D. Brainard, Esq., Peoria, Ill.*—DEAR SIR: I accepted your offer on S. W. ¼ 17, 30, 2 E., and telegraphed you on the 29th, as I was on my way to our state convention, and on my return, four days later, find your answer O. K. I send you a deed to execute, and send to the Bow Valley Bk., Hartington, and your money will be there, spot cash, and no commissions. I have not seen Mr. Comstock yet, but I do not want deed from him under a power of attorney. I use a warranty blank, but make a special warranty excepting the tax deed, and all other taxes, and hope it will be satisfactory. Execute and return immediately. I think Jenel has been trying to speculate off you, and get you into a lawsuit, or make some money of you.

"Respectfully,　　　　　　　　　　　　W. A. POLLOCK."

*Seventh.* Pollock's letter announcing the commencement of this action, being—

EXHIBIT F.

"COLERIDGE, CEDAR COUNTY, NEB., May 8, 1884.

"*Chas. D. Brainard, Esq., Peoria, Ill.*—DEAR SIR: Your letter of April 16th was received, offering to take $500 for your claim on S. W., Sec. 17, 30, 2 E., and on April 29th I telegraphed you that I would accept your offer, and pay you the $500 at the Bow Valley Bk., to which you answered accepted; saying you would instruct Mr. Comstock to deed, or order the papers back and deed yourself. I immediately deposited the money in the Bow Valley Bank. Mr. Comstock refused to deed to me on our contract, and still refuses, unless I would give him $100 extra, which I will not do. I was obliged to commence an action against you to protect myself. I commenced my action before Mr. Comstock put his power of attorney on record, or made any transfer, and I do not care how many times he sells it. I am in possession under the tax title, and hold it by purchase of the quitclaim of you; and I understand Mr. C. sold it to some parties in Peoria. In fact, I got a telegram today from the parties, as I supposed. You can make the sale as you agreed, or you can let it run, but old John Comstock wont live long enough to see you through with it. He is old now, and the sale to the Peoria parties is a fraud, and it has put the title in bad shape, all of which is a damage, and I am sorry to have make you trouble after I supposed all was arranged satisfactorily.

"Respectfully,　　　　　　　　　　　　W. A. POLLOCK."

Counsel for defendants claim that, technically, the first telegram, the fourth paper in the foregoing correspondence, is not proved. The sending of such telegram is alleged in the bill. The answer of Brainard, duly verified, denies that he received the telegram "such as is copied in the complainant's bill." That some communication was received by Brainard is evident from the telegram he sent. Pollock testifies that he sent the telegram just as copied in the bill, and produces a copy made by himself at the time of sending. Brainard, though sworn as a witness, and also notified to procure papers, neither produces the telegram actually received, nor says a word about it in his deposition. Under these circumstances all the requirements of equity practice are complied with, and it must be taken as proved that such a telegram passed between the parties and formed part of the alleged contract.

Again, it is alleged that the contract is uncertain and incomplete for want of a definite description of the land. The state is not named, and, for ought that appears, it may refer to some other similarly numbered quarter section in any other state. *Id certum, quod certum reddi potest.* The residence of the writer making the inquiry, the assertion of a tax deed in the two letters, and the alleged conference with the assumed agent, imply a location within the state. The statement in the same letter that the writer then had teams breaking the land, followed by the evidence sustaining such statement, also identifies; and the further statement in the letter in reply, that "Mr. Comstock is now in your vicinity, and has power of attorney to act for me," followed by a production of the power of attorney in which the land is expressly described as in Cedar county, Nebraska, is conclusive as to the identification.

Again, it is insisted that there was no distinct, clear, positive, and unconditional offer and acceptance, so that it can be affirmed that there was a definite and unconditional contract between the parties. I think otherwise. The first letter is an inquiry as to the price at which the owner will sell. The reply affirms a preference for a sale, and says $500 is wanted for the owner's interest. The third letter contains an offer of $400. Before any action by the owner on this offer, and before any withdrawal of the notice contained in the first letter from the owner, comes the unconditional acceptance in the first telegram, and asking that deed be sent to Bow Valley Bank, and to clinch the matter is the reply telegram. I do not understand that telegram as authorizing further negotiations. In view of what had passed between the parties, the only fair interpretation is that of a direction to the agent to close the trade, and deliver a deed upon the offer made and accepted, or, in case of his failure so to do, to return papers to the owner, coupled with a further promise to himself make the deed. I have no doubt of a full agreement between the parties at that time. The place named by the buyer, the Bow Valley Bank, as the place for the delivery of the deed, was accepted without objection by the

vendor. Indeed, the place of delivery of the deed was a mere incident to the sale, and not necessarily a vital part of the terms of the contract. The case of *Sawyer* v. *Brossart,* from the supreme court of Iowa, reported in 25 N. W. Rep. 876, differs from this in wanting the last approving telegram from the vendor. It differs also in this: that the acceptance here does not specify the place of payment, and if, under the offer, payment was necessary at the residence of the vendor, the acceptance was as broad as the offer. Of course, it may be said that the place of delivery implies the same place of payment, and that such was not the condition of the offer. Whatever force there may be in this is all obviated by the confirming telegram from the vendor, directing a delivery personally, by his agent, to the purchaser, and a promise himself to make title if the agent did not.

Still further, the point was pressed that no tender was made before suit, and that before service of process the vendor had conveyed to a *bona fide* purchaser. The facts are these: Mr. Pollock was away from home when the confirming telegram from the vendor was received. After his return, and on the fifth of May, he deposited $450 in the Bow Valley Bank, where he had already on deposit over $50. This deposit was general, to his own order, and not special, to apply to the payment for the deed when received. After making the deposit, he met Mr. Comstock, the agent of the vendor, told him of his purchase, and was informed that he could have the land for $600. Some further conversation followed, the upshot of which was that Comstock claimed to have the selling of the land, and insisted upon $600. Thereupon, on May 6th, the next day, plaintiff filed a petition in the state court against Brainard alone, asking a decree for specific performance. Brainard being a non-resident, service was possible only by publication. The same day that this petition was filed, and only an hour or two thereafter, Comstock, under his power of attorney, and in the name of his principals, executed and filed for record a deed of the property to one Jacob Darst, of Peoria, Illinois, the place of residence of both Brainard and Comstock. The consideration was $500, and not $600, the sum he demanded of Pollock. This deed to Darst was not in pursuance of any special contract therefor, but by virtue of a general understanding, as Comstock says, that whenever he found a piece of land cheap, and a speculation, he was authorized to purchase it for Darst. He telegraphed Darst to pay the $500 to Brainard, which he did. On May 10th Brainard and wife personally executed a further deed to Darst, and on June 14, 1884, about a month thereafter, Darst and wife conveyed the premises to Comstock for the same consideration. Thereafter, by amendment, Comstock was made party defendant, and both he and Brainard have appeared and answered. Now, upon these facts, I remark that no tender was necessary because of a flat refusal to perform the contract, and a disabling himself, by the vendor, of the

power to perform by conveying to another. While the conveyance may not have been made until an hour or two after the filing of the petition, yet the demand of $600 by the agent as a condition of a conveyance was tantamount to a repudiation of the contract, and that was before any suit. Brainard's subsequent contract in receiving the $500 from Darst, and executing a personal deed, was a ratification of the acts of his agent, and related back to the time of such acts. Darst was no *bona fide* purchaser. If he was anything more than a tool of Comstock, which seems doubtful, Comstock was his agent to buy, and the knowledge of the agent was his knowledge.

Finally, counsel urge that there is no equity in enforcing the contract, and says: "Observe Pollock's method in his attempt to procure 160 acres, of $10 per acre, Nebraska land, for $3, or dollars for cents." I think few cases arise in which specific performance is more equitable and just. The price was named by the vendor. Mr. Pollock told him he had a tax title, and claimed that it was good, but the vendor knew beforehand of this tax title. Whether it was good or not is undisclosed. It may, for aught that appears, have been a perfect title. At any rate, there was no concealment—no misrepresentations—by the purchaser; and the vendor freely fixed his price. More than that, he finally took just that price from another. Comstock, who, on the 5th, talks as though Brainard ought to have $600, hastens the next day to sell the land for $500. I cannot resist the conviction that Comstock was seeking to speculate off his principal, and wanted to pocket $100 himself, and that, finding himself baffled in his scheme, sought revenge by conveyance to Darst. I am satisfied to know that the burden of this litigation is to rest upon him.

A decree will be entered in favor of complainant, quieting his title as against Brainard, and, upon the payment of $500 into the registry of this court, perpetually enjoining the ejectment suit brought by Comstock, and compelling conveyance from Comstock to complainant in specific performance of the original contract.